# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| FAH LIQUIDATING CORP. (f/k/a FISKER AUTOMOTIVE HOLDINGS, INC.), *et al.*, | ) ) ) | Case No. 13-13087 (KG) (Jointly Administered) |
| Debtors. | ) ) | |
| SVEN ETZELBERGER, on behalf of himself and all others similarly situated, | ) ) ) | |
| | ) ) | |
| Plaintiff, | ) ) | Adv. Pro. No. 13-52517 (KG) |
| v. | ) ) | |
| FISKER AUTOMOTIVE HOLDINGS, INC. and FISKER AUTOMOTIVE, INC., | ) ) ) | |
| | ) **)** ) | **Re: Adv. Dkt. No. 51** |
| Defendants. | ) | |

## OPINION

## INTRODUCTION

What follows is the Court's decision on a motion for partial summary judgment and the opposition to the motion. On November 22, 2013 (the "Petition Date"), Fisker Automotive Holdings, Inc. and Fisker Automotive, Inc. (collectively, "Fisker") sought relief under Chapter 11 of the Bankruptcy Code. (D.I. 1.)[1] On November 26, 2013, Sven Etzelsberger on behalf of himself and as Class Representative of the WARN Class ("Plaintiff") brought this adversary proceeding against Fisker alleging violation of the

---

[1] References to "D.I." refer to the main bankruptcy proceeding's docket. References to "Adv. D.I." refer to this adversary proceeding's docket.

federal Worker Adjustment and Retraining Notification Act ("WARN Act") and the California WARN Act. (Adv. D.I. 1.) On July 28, 2014, the Court confirmed the Debtors' Second Amended Joint Plan of Liquidation (the "Plan"). (D.I. 1137.) The Plan segregated $1,900,000 into a WARN Claims Reserve for potential distribution to the WARN Class subject to the outcome of this proceeding. (Plan, p. 13.) The Plan also allowed Hybrid Tech Holdings, LLC ("Hybrid") and Emerald Capital Advisors (the "Trustee") to defend this litigation. (*Id.* at 28.)

Before the Court is Plaintiff's motion for partial summary judgment (the "Motion") pursuant to Federal Rule of Civil Procedure 56, made applicable here by Federal Rule of Bankruptcy Procedure 7056. (Adv. D.I. 51.) Plaintiff seeks determination that: (i) the WARN Class's claims are entitled to priority under sections 507(a)(4) and (5) of the Bankruptcy Code; and (ii) liability is established under the California WARN Act. (*Id.*)

Hybrid filed an answering brief opposing summary judgment on the priority issue because genuine disputes of material facts exist. (Adv. D.I. 62, ¶¶ 1-9; pp. 25-31.) Hybrid also argued that the Court should not consider the California WARN Act issue at this stage because the parties informally agreed to bifurcate the issues into separate litigation phases. (*Id.* at pp. 31-34.) The Trustee joined Hybrid's call for the Court's deferment of the California WARN Act issue. (Adv. D.I. 66.)

For the reasons stated herein, the Court finds that genuine issues of material facts exist as to whether the WARN Class's claims are entitled to priority under sections 507(a)(4) and (5) of the Bankruptcy Code. The Court will therefore deny Plaintiff partial

summary judgment. Pursuant to the papers and the discussion at oral argument, the Court will not render a decision on the California WARN Act issue at this time.

## JURISDICTION

The Court has jurisdiction over this adversary proceeding and the judicial authority to enter a final order pursuant to 28 U.S.C. §§ 157 and 1334. Venue in the District of Delaware is proper pursuant to 28 U.S.C. §§ 1408 and 1409. A claim for priority under sections 507(a)(4) and (5) is a "core" proceeding under 28 U.S.C. § 157(b)(2)(A).

## BACKGROUND[2,3]

In 2007, Fisker was founded with the goal of designing, assembling and manufacturing premium plug-in hybrid electric vehicles ("PHEVs"). (P.A., A409-10, ¶ 5.) To partially fund its venture, Fisker drew $192 million from a $530 million United States Department of Energy ("DOE") loan (the "DOE Loan") (*Id.*) Fisker was renowned for, *inter alia*, its Karma sedan, the world's first eco-friendly luxury PHEV. (*Id.*) Four years after inception, Fisker brought Karma to market. (P.A., A409-10, ¶ 5; A414-15, ¶ 17.)

Fisker faced numerous problems. The DOE's loan required Fisker to produce, manufacture, and sell Karma sedans by February 2012. (P.A., A409-10, ¶ 5) However, Fisker delayed production until October 2011 due to certain engineering, tooling, component specifications, testing and certification issues. (P.A., A410, ¶ 6.) Although

---

[2] The references to "P.A." and "H.A." mean Plaintiff's Appendix to Opening Brief in Support of Plaintiff's Motion for Partial Summary Judgment (Adv. D.I. 56) and Hybrid's Appendix in Support of Answering Brief to Plaintiff's Motion for Partial Summary Judgment (Adv. D.I. 63), respectively.

[3] The Background focuses on the less controversial facts leading up to the Petition Date. The Court will address the disputed facts between the April 5, 2013 WARN Class Termination date and the alleged October 2, 2013 "cessation of business" date in the Discussion section, *infra*.

Fisker deemed itself an original equipment manufacturer ("OEM") (P.A., A423, ¶ 38), it did not produce Karma. (P.A., A414, ¶¶ 14, 15.) Fisker merely planned to build future cars at its Delaware manufacturing facility. (*Id.*) Instead, Valmet Automotive, Inc. ("Valmet") in Finland, assembled the Karma sedan. (P.A., A414, ¶ 14.)

Post-production, Karma failed to meet sale expectations due to, *inter alia*, "negative press, initial quality and performance issues, lingering effects of the global financial recession, and challenges arising from the Debtors' supply chain." (P.A., A410-11, ¶ 7.) In July 2012, Fisker scheduled a seasonal shutdown of Karma's production. (P.A., A410-11, ¶ 7; A424-25, ¶ 41.) In October 2012, A123 Systems, Inc., Fisker's exclusive battery supplier, suspended production and filed bankruptcy, leaving Fisker without high-voltage batteries. (P.A., A410-11, ¶ 7.) In October 2012, Hurricane Sandy destroyed almost all of Fisker's United States Karma inventory. (P.A., A425, ¶ 42.) By the end of October 2012, Fisker ceased Karma production. (P.A., A410-11, ¶ 7; A424-25, ¶ 41.)

In November 2012, Fisker's management developed two plans. (P.A., A22.) Plan A sought, *inter alia*, to reduce "near-time cash burn," acquire $150 million of funding and restart Karma production in July 2013. (P.A., A22; A29.) Plan B contemplated, *inter alia*, moving away from Karma to develop the Atlantic sedan in August 2013. (P.A., A22; A32.) Management recommended Plan A. (P.A., A39.)

In December 2012, Fisker determined that $150 to $200 million was needed to restart Karma production and thus searched for investors. (P.A., A21; A63; A426, ¶ 45.) In January 2013, realizing that it would only have $1.5 million through March 2013, Fisker considered a strategic partnership, sale or liquidation. (P.A., A89-92.) On March 14, 2013,

4

Fisker planned to ask the DOE for access to frozen funds so that it could continue to find stalking horse bidders for a bankruptcy sale or an alternative going concern transaction. (P.A., A157.) The DOE denied Fisker's request and urged a bankruptcy filing. (P.A., A190.)

On March 26, 2013, Fisker's Board of Directors discussed the DOE's desire for Fisker to "terminate a significant portion of its workforce during the week ended March 29, 2013" and file bankruptcy. (P.A., A203-04.) On April 5, 2013, Fisker terminated one-hundred-and-fifty-six employees (the "WARN Class Terminations"). (P.A., A228-30.) Fisker retained fifty-three employees who were integral to the marketed assets or necessary for bankruptcy administration. (P.A., A231; A217-20.) After the WARN Class Terminations, Fisker received interim funding to stave off chapter 11 and continued searching for stalking horse bidders pursuant to an asset purchase agreement. (H.A., B140.)

By the end of September 2013, Fisker only had twenty employees. (P.A., A239.) On October 11, 2013, the DOE held a live auction to sell its interest in the DOE Loan. (P.A., A427-28, ¶¶ 49-50.) On November 22, 2013, the sale to Hybrid closed (P.A., A428, ¶ 50.) and Fisker filed bankruptcy. (D.I. 1.)

**STANDARD OF REVIEW**

A bankruptcy court must grant summary judgment where "there is no genuine issue as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Bankr. P. 7056; Fed. R. Civ. P. 56(a). In evaluating the evidence, the court must view the inferences to be drawn from the underlying facts in the light most favorable to

the non-movant. *In re Kiwi Int'l Air Lines, Inc.*, 344 F.3d 311, 316 (3d Cir. 2003) (citation omitted). If the movant meets its initial burden with sufficient proof to support its motion, then the burden shifts to the non-movant to prove a genuine dispute of material fact exists rendering summary judgment inappropriate. *IT Litig. Trust v. Alpha Analytical Labs (In re IT Grp., Inc.)*, 331 B.R. 597, 600 (Bankr. D. Del. 2005). The non-movant must go beyond the pleadings and identify specific facts showing a genuine issue for trial. *Id.* A genuine issue of material fact exists where, given the evidence, a reasonable jury could rule in favor of the non-movant. *Id.* (citation omitted).

### DISCUSSION

The question is whether genuine disputes of material facts exist concerning Fisker's alleged October 2, 2013 "cessation of business" date. The Court finds that genuine disputes of material facts exist. Hybrid presented facts showing that while Fisker terminated substantially all of its employees, Fisker did not cease to perform its usual work or liquidate. Summary judgment on the priority issue under sections 507(a)(4) and (5) is inappropriate.

**A. Legal Standard**

Section 507(a) affords certain parties an allowed unsecured priority claim. Section 507(a)(4) states in relevant part:

> (a) The following expenses and claims have priority in the following order:
>  (4) Fourth, allowed unsecured claims, but only to the extent of $10,000 for each individual . . . earned **within 180 days before** the date of the filing of the petition or **the date of the cessation of the debtor's business**, whichever occurs first, for—
>   (A) wages, salaries, or commissions, including vacation, severance, and sick leave pay earned by an individual;

11 U.S.C. § 507(a)(4) (emphasis added). Section 507(a)(5) echoes the same for an employee benefit plan subject to certain unrelated exceptions. 11 U.S.C. § 507(a)(5). The "cessation of business" language was added to "protect employees whose employer stops paying them, or pays them at a reduced rate, and goes out of business, but then waits longer than [one-hundred-and-eighty] days to file a bankruptcy petition." *In re Bodin Apparel, Inc.*, 46 B.R. 555, 559 (Bankr. S.D.N.Y. 1985), *aff'd*, 56 B.R. 728 (S.D.N.Y. 1985) (citation omitted).

Section 507(a)(4) is "'unambiguous,' and the resolution of the case . . . 'requires nothing more than a sound exercise in statutory interpretation.'" *Boatwright v. Rau (In re Rau)*, 113 B.R. 619 (B.A.P. 9th Cir. 1990) (citing *Davidson Transfer & Storage Co. v. Teamsters Pension Trust Fund*, 817 F.2d 1121, 1123 (4th Cir. 1987)). Whether a "cessation of business" exists is a factual inquiry. Courts are "not bound by legal formalism" and "may always pierce a paper existence." *Davidson*, 817 F.2d at 1123-24. Despite the paucity of cases on this issue, a balancing test exists. *Bodin*, 56 B.R. at 732 (citing *In re Adcock Excavating, Inc.*, 42 B.R. 84, 86 (Bankr. N.D. Ill. 1984)). That test examines whether a debtor: (1) discharged all or substantially all of its employees; (2) ceased performing its usual work; and (3) continued in business or liquidated. *Bodin*, 56 B.R. at 732 (citing *Adcock*, 42 B.R. at 86-87); *accord In re Winter Mfg. Inc.*, No. 09-10676, Doc. No. 146, at 12 (Bankr. D. Vt. Sept. 29, 2011).

**B. Analysis**

    1. <u>**Fisker Discharged All or Substantially All of its Employees**</u>

The first issue is whether Fisker discharged all or substantially all of its employees. *Bodin*, 56 B.R. at 732 (citing *Adcock*, 42 B.R. at 86-87). On April 5, 2013, Fisker terminated

7

substantially all of its employees when it discharged one-hundred-and-fifty-six employees, leaving only fifty-three. By October 2, 2013, Fisker had twenty employees. From April 5, 2013 to October 2, 2013, Fisker's workforce was reduced by ninety percent. Hybrid does not dispute this point and focused its argument on the second prong. (*See* Adv. D.I. 62, pp. 27, 29.) Thus, this factor weighs in favor of Plaintiff.

### 2. Fisker Ceased Performing its Usual Work

#### a. Legal Standard

Second is whether Fisker ceased to perform its usual work as of October 2, 2013. *Bodin*, 56 B.R. at 732 (citing *Adcock*, 42 B.R. at 86-87). There is no bright-line test to determine how much business activity is necessary for a debtor to remain in business. *Bodin*, 46 B.R. at 559. In *Bodin*, a cessation of business existed because activities incidental to liquidation did not constitute conducting business. *Id.* at 561. However, in *Adcock*, the court found that a cessation of business did not exist where the debtor employed persons on a reduced scale to perform its usual work through the petition date. 42 B.R. at 87. In *Winter*, although "there was no production at the facility[,]" some employees "continued to perform non-production work" including "the design, marketing, and sale of panels." No. 09-10676, at 14. The debtor did not cease performing its usual work even though some work was "potentially a windup of the Debtor[.]" *Id.* at 14-15.

#### b. Plaintiff's Argument and Facts

Plaintiff argues that after the WARN Class Terminations, Fisker ceased its usual work of being an OEM. Instead, Fisker merely conducted wind down activities and sought to conduct an asset sale and liquidate in bankruptcy. Plaintiff relies on the

8

Declaration of Elisabeth Gristsch. (P.A., A460-466.)[4] Plaintiff assumes that Fisker's sole business was being an OEM. (P.A., A461, ¶ 6.) After the WARN Class Terminations, Fisker was "no longer capable of manufacturing cars." (*Id.* at ¶ 7.) The fifty-three remaining employees were necessary to acquire a stalking horse bidder for a section 363 sale. (Adv. D.I. 55, p. 22; *see also* P.A., A282.)

After April 2013, even if Fisker had new financing and maintained its lost vendors, it could not have returned to being an OEM; Fisker had a "long list of needed fixes" and several "unresolved quality issues." (P.A., A462, ¶¶ 12, 14.) The remaining employees engaged in menial winding down tasks. (P.A., A462-63, ¶¶ 17-25.) After the WARN Class Terminations, Fisker did not hold any meetings except for sporadic group talks led by the Chief Restructuring Officer Hugh Sawyer ("Mr. Sawyer") or co-founder Bernhard Koehler. (P.A., A464, ¶ 26.) By October 2, 2013, Fisker no longer performed its usual work of being an OEM. Fisker was merely winding down and seeking financing and/or a purchaser for a bankruptcy sale. Thus, Plaintiff concludes Fisker's business ceased by October 2, 2013.

### c. Hybrid's Specific Facts Showing Genuine Dispute of Material Facts

Hybrid presented two arguments. First, a "cessation of business," requires the discontinuation of all business operations, not merely a scale-back or change in operations. *Plaintiff's Class Claimants in N.J. Actions v. Elsinore Corp. (In re Elsinore Corp.)*,

---

[4] Ms. Gristsch was Fisker's Manager, Quality & Process Leadership. She worked at Fisker from January 2010 until March 24, 2014 when Fisker was sold. She remained at the successor company until October 2015. (P.A., A460, Gristch Decl., ¶¶ 1-2.)

228 B.R. 731, 733 (BAP 9th Cir. 1998) (citing *Rau*, 113 B.R. at 622); *accord Davidson*, 817 F.2d at 1123 (an employer did not cease its business when it closed one of its divisions and laid off 600 of its 800 employees). Second, Fisker did not cease doing its usual work by October 2, 2013 because Fisker continued to develop the Fisker Restart Plan post-petition.

Fisker's business was amorphous. (Adv. D.I. 62, ¶¶ 10-74, pp. 30-31.) In 2007, Fisker was a "high-tech startup" with the goal of developing PHEVs. (*Id.* at ¶ 10, p. 30.) From 2007 to 2011, Fisker went from designer, to developer, to manufacturer of the Karma sedan. (*Id.* at ¶¶ 10-13, p. 30.) In October 2011, Valmet in Finland manufactured the Karma sedans. (*Id.* at ¶ 14, p. 30.) By late 2012, Fisker ceased all Karma production for good. (*Id.* at ¶ 17; p. 30; MB Decl. ¶ 7; H.A., B1656.) From January to March 2013, Fisker's business was developing a plan to restart Karma production (the "Fisker Restart Plan") in the event financing was secured. (Adv. D.I. 62, ¶¶ 22, 24, p. 30-31; H.A., B14-36.) In March 2013, the Fisker Restart Plan was in full effect. (Adv. D.I. 62, ¶ 30.) Fisker planned to restart Karma production in Delaware in January 2014. (*Id.* at ¶ 29; P.A., A123, A128.)

After April 5, 2013, Fisker's remaining fifty-three employees continued with the Fisker Restart Plan. (Adv. D.I. 62, ¶ 43, p. 31.) On May 13, 2013, Fisker assessed the Fisker Restart Plan's software engineering hiring needs. (Adv. D.I. 62, ¶ 45, p. 31; H.A., B145-48.) On May 21, 2013, Fisker employees scheduled meetings for the "Karma Re-Start Package Review." (Adv. D.I. 62, ¶ 45; H.A., B149-50.) On May 29, 2013, Ms. Gritsch received a copy of Fisker's "KARMA relaunch" presentation outlining a revised model strategy for Karma's model year ("MY") 2014. (Adv. D.I. 62, ¶ 46; H.A., B164-83.)

Ms. Gritsch claimed that meetings ceased after April 5, 2013, except for occasional group talks. (P.A., A464, ¶ 26.) Hybrid identified facts showing that Ms. Gritsch was "directly involved in numerous meetings" for Fisker's Restart Plan. (Adv. D.I. 62, ¶ 44, p. 31.) In fact, Fisker employees rescheduled a June 6, 2013 meeting to discuss the "K1 Restart" to accommodate Ms. Gritsch's schedule. (Adv. D.I. 62, ¶ 46; H.A., B209-10.) In mid-June 2013, Ms. Gritsch collected comments from Fisker employees and made updates to Karma's Restart Plan. (Adv. D.I. 62, ¶ 49; H.A., B307-312; B314-399; B487-488.) At the same time, Ms. Gritsch participated in weekly meetings with Fisker employees to discuss the Karma Restart Plan. (Adv. D.I. 62, ¶ 49; H.A., B215; B313-314; B487; B494). On June 24, 2013, Fisker employees discussed the Fisker Restart Plan's timeline for purchasing and supply chains. (Adv. D.I. 62, ¶ 50; H.A., B491-493.) In July 2013, Ms. Gritsch continued to attend meetings. (Adv. D.I. 62, ¶ 51; H.A., B494, B638-672.) She also worked extensively on Karma's outstanding quality JIRA (Fisker's management system) issues. (Adv. D.I. 62, ¶ 51; H.A., B619-637, B685-687.) As of July 26, 2013, Fisker had about forty resources working on, *inter alia*, improving Karma. (Adv. D.I. 62, ¶ 52; H.A., B688.)

Mr. Sawyer testified that Fisker's management never abandoned the search for new funding or active planning of the Karma Restart Plan. (H.A., B1689-90.) Members of Fisker's management team travelled the world through "the summer months and fall [of 2013]" to find a white knight buyer or investor. (*Id.*) Ms. Gritsch echoed the same; Fisker wanted to be able to to jumpstart manufacturing if financing was secured. (Adv. D.I. 62, ¶ 61; H.A., B1734:15-1735:13; B1738:10-1740:20; B1743:23-1744:8; B1749:11-23.)

On October 16, 2013, Ms. Gritsch circulated an earlier version of the Karma Restart Plan to directors and wanted to prioritize critical JIRA issues. (Adv. D.I. 62, ¶ 62; H.A., B691-781.) On October 18, 2013, she scheduled a meeting to discuss the open JIRA issues. (Adv. D.I. 62, ¶ 64; H.A., B878-81.) On October 21, 22, 28, and 30, 2013, Fisker employees discussed the Fisker Restart Plan and its budgets at meetings that included Ms. Gritsch. (Adv. D.I. 62, ¶ 64; H.A., B882-87; B890-926; B931.) From late October to mid-November 2013, Fisker continued to work on the Fisker Restart Plan as it related to, *inter alia*, hiring, budgeting and open JIRA issues. (Adv. D.I. 62, ¶ 69; H.A., B955-88; B1074-89; B1089; B1092; B115-33; B1264-78.) At the same time, Ms. Gritsch organized a meeting with Fisker employees to discuss her Program Direction Letters for the K1 Karma MY 2016 and K4 Karma MY 2018. (Adv. D.I. 62, ¶ 70; H.A., B935-54; B1092-114.) Post-petition, Fisker continued to work on the Fisker Restart Plan. (Adv. D.I. 62, ¶ 74; H.A., B1279; B1781; B1288.)

    d. **Result**

The foregoing facts show that prior to April 5, 2013, Fisker ceased Karma production. However, prior to April 5, 2013, Fisker shifted its *usual work* to developing the Karma Restart Plan. Fisker continued to work on that plan through the alleged October 2, 2013 "cessation of business" date. Thus, this factor weighs in favor of Hybrid.

    3. **Fisker Continued in Business**

The third factor is whether Fisker continued in business or liquidated as of the alleged "cessation of business" date. *Bodin*, 56 B.R. at 732 (citing *Adcock*, 42 B.R. at 86-87). In the previous section, the Court found that Hybrid identified sufficient facts showing

12

that Fisker continued to develop the Karma Restart Plan post-petition. Fisker was not liquidated as of October 2, 2013. This factor weighs in favor of Hybrid.

### 4. Conclusion

The Court analyzed the three factors used in determining whether a debtor ceased its business. One factor weighs in favor of Plaintiff. Two are in favor of Hybrid. The most important factor here, whether Fisker ceased its usual work by October 2, 2013, is subject to several genuine disputes of material facts. Hybrid presents sufficient facts showing that whether there was a cessation of Fisker's business by October 2, 2013 is subject to genuine disputes of material facts. Viewing the facts in the light most favorable to Hybrid, summary judgment on the priority issue under sections 507(a)(4) and (5) is inappropriate.

### C. The California WARN Act Claim

Plaintiff briefed the applicability of the California WARN Act and sought partial summary judgment to establish Fisker's violation. Hybrid did not brief the issue and instead reported that the parties had agreed to bifurcate the issues and, if necessary, to raise them later. The Court accepts Hybrid's position and will defer decision on the California WARN Act claims at this time.

### D. Hybrid's Evidentiary Objections

Hybrid objects to certain of Plaintiff's evidence on the grounds of testimony by a lay witness, lack of personal knowledge, relevance and hearsay. (Adv. D.I. 62, p. 5 n.3; Ex. A.) Plaintiff counters that the evidence was based on the witness' perception or personal knowledge, that the Court can determine relevance and that the hearsay allegations are non-hearsay or covered by an exception. (Adv. D.I. 73, pp. 13-15; Ex. A.)

Hybrid's objections are unpersuasive. Thus, the Court will overrule Hybrid's evidentiary objections, but Hybrid may renew its objections should the adversary proceeding go to trial.

## CONCLUSION

For the foregoing reasons, the Court will deny Plaintiff's motion for partial summary judgment of the WARN Class's request for priority under sections 507(a)(4) and (5). Genuine disputes of material facts exist which must be resolved at a trial. The Court will not render a decision on the California WARN Act issue at this time.

Dated:  May 28, 2019

KEVIN GROSS, U.S.B.J.