# IN THE UNITED STATED BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| FAH LIQUIDATING CORP. (f/k/a/ FISKER AUTOMOTIVE HOLDINGS, INC.), *et al.*, | ) ) ) | Case No. 13-13087-KG |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| SVEN ETZELSBERGER, on behalf of himself and all others similarly situated, Plaintiff, | ) ) ) ) | |
| | ) | |
| v. | ) ) | Adv. Pro. No. 13-52517-KG Re: D.I. 89 |
| FISKER AUTOMOTIVE HOLDINGS, INC. and FISKER AUTOMOTIVE, INC., Defendants. | ) ) ) | |

## OPINION

### INTRODUCTION

The Court presided over a trial in this adversary proceeding on November 12 and 13, 2019. Previously, on November 22, 2013, Fisker Automotive Holdings, Inc. and Fisker Automotive, Inc. (collectively, "Fisker") filed petitions for relief under Chapter 11 of the Bankruptcy Code (the "Code"). On November 26, 2013, Sven Etzelsberger ("Plaintiff"), in his personal capacity and in the capacity of Class Representative to the WARN Class, filed this adversary proceeding against Fisker. He brought the case pursuant to the Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101, *et seq.* (the "WARN Act") and the California Labor Code, § 1400 *et seq.*[1] The issue for the Court is whether Fisker experienced a "cessation of business" within the meaning of §§ 507(a)(4) and (a)(5) of the Code prior to October 2, 2013. The Court presided over the trial, read the case law, reviewed the evidence, and has reached its decision. The Court finds that

---

[1] The parties did not present evidence regarding the California Labor Code.

1

Fisker's business ceased prior to October 2, 2013 when, on April 5, 2013, it terminated the very employees who now bring this claim. Accordingly, the Court finds in favor of Plaintiff and the WARN Class.

## **JURISDICTION**

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper in the District of Delaware pursuant to 28 U.S.C. §§ 1408 and 1409. Claims for priority treatment under 11 U.S.C. §§ 507(a)(4) and (a)(5) are core proceedings pursuant to 28 U.S.C. § 157(b)(2)(A).

## **FACTS** [2]

In 2007, Fisker was formed with the goal of designing, assembling, and manufacturing plug-in hybrid electric vehicles ("PHEVs"). (Plaintiff's Trial Exhibit "P.E." No. 48 at A409.) In pursuit of this venture, Fisker secured a loan from the United States Department of Energy ("DOE") for $530 million (the "DOE Loan"), from which Fisker drew approximately $192 million. (FPO at ¶ 1.) The DOE Loan contained certain milestones, including that Fisker sell 11,000 units of its flagship automobile, the Karma sedan (the "Karma"), by February 2012. (P.E. No. 48 at A410.) The Karma was the world's first environmentally-friendly luxury PHEV. (FPO at ¶ 1.)

Despite the Karma's innovativeness in the PHEV market, Fisker failed to meet its February 2012 sales milestone. (FPO at ¶ 4.) This failure resulted largely from Fisker's delayed initiation of Karma production until October 2011 due to certain engineering, tooling, testing, certification, and

---

[2] The Court will refer to the Final Pretrial Order throughout the opinion as the "FPO." All facts cited to the FPO come from Section III (statement of facts which are admitted and require no proof). The Court may rely on the undisputed facts stipulated to by the parties found in the FPO. *See, e.g. Kohut v. Ackerman & Ackerman P.C. (In re McInerney)*, 530 B.R. 671, 672–73 (Bankr. E.D. Mich. 2015); *Gold v. Nova World Int'l, LLC (In re Harvey Goldman & Co.)*, 489 B.R. 657, 658 n.1 (Bankr. E.D. Mich. 2013). The remaining findings of fact come from trial evidence.

component specification issues. (P.E. No. 48 at A410.) A safety recall immediately following the Karma launch also impacted sales. (FPO at ¶ 4.) Although Fisker deemed itself an original equipment manufacturer ("OEM"), (P.E. No. 48 at A423), Valmet Automotive, Inc. ("Valmet") assembled the Karma in Finland from its launch in October 2011 and until Fisker stopped Karma production for a scheduled seasonal shutdown in July 2012. (P.E. No. 48 at A410–11.)

Following the seasonal shutdown, Fisker intended to move Karma production to a facility it purchased in Delaware. (P.E. No. 48 at A414.) But Karma production never restarted in Delaware, Finland, or anywhere else. (FPO at ¶ 6.) In October 2012, the sole company responsible for supplying Fisker with Karma's high-voltage battery pack filed for bankruptcy, leaving Fisker without a battery pack supplier. (P.E. No. 48 at A410–11.) Also in October 2012, Hurricane Sandy destroyed substantially all of Fisker's United States Karma inventory, and insurance denied coverage for the loss. (P.E. No. 48 at A425.) By the end of October 2012, Fisker officially ceased Karma production. (FPO at ¶ 5.)

In November 2012, Fisker's Board of Directors (the "Board") contemplated three plans to move the company forward. (Transcript of the Evidentiary Hearing held on November 13, 2019 "Tr. Day 2," 16:18–20.) The first plan included finding a strategic partner to contribute $150 million and resuming Karma production either in Delaware or overseas. (FPO at ¶ 8.) The second plan included reducing headcount by 50%, ceasing Karma production, and developing Fisker's next automotive model, the Atlantic sedan (the "Atlantic"). (FPO at ¶ 8.) And the third plan included Fisker licensing or marketing its powertrain technology to other OEMs to incorporate into their cars. (Tr. Day 2, 37:25, 38:1–2.) The Board selected to pursue the first plan (FPO at ¶ 8) and in December 2012 Fisker began searching for investors with the help of outside advisors. (FPO at ¶ 11.)

3

In December 2012, Fisker management determined the cost to restart Karma production had increased to $200 million. (FPO at ¶ 12.) Management also determined that Fisker's path forward required that the DOE waive a $30 million minimum cash requirement on the DOE Loan. (FPO at ¶ 12.) The Board learned that Fisker might need to file for bankruptcy as soon as January 2013. (FPO at ¶ 14.)

In January 2013, realizing that it would only have $1.5 million through March 2013, Fisker considered three paths: a strategic partnership, a sale, or a liquidation. (FPO at ¶ 10.) On January 18, 2013, the Board hired Huron Consulting Services LLC ("Huron") as adviser to the Board. (P.E. No. 10 at A97.) Also in January 2013, the Board discussed the risk that lack of funding had on the prospective relaunching of Karma production. (FPO at ¶ 15.)

By mid-February, Fisker entered "hibernation mode." (FPO at ¶ 18.) With the cessation of Karma manufacturing, hibernation mode entailed U.S.-based Fisker employees identifying open quality control issues previously assigned to Valmet employees in Finland and transferring those issues to Fisker employees in the United States using Fisker's "JIRA" database.[3] (FPO at ¶ 18.)

On March 7, 2013, the Board directed management to prepare "forward-looking estimates and pro forma business plans" that contemplated the relaunch of Karma production and initiation of the Atlantic program. (P.E. No. 12 at A105.) On March 8, 2013, the Board received one such plan, which indicated that to accomplish the plan, Fisker needed up to $300 million in funding. (FPO at ¶ 20.) The plan also included moving Karma production from Finland to Delaware, which would delay the relaunch of Karma production from May 2013 to January 2014, and included an update on the Atlantic program, which indicated that production of the first automobile in the Atlantic series would commence in August 2015. (P.E. No. 14 at A123, A125.)

---

[3] JIRA was a software Fisker used internally to track all issues with its cars. (Transcript of the Evidentiary Hearing held on November 12, 2019 "Tr. Day 1," 139:1–2.)

4

On March 14, 2013, the Board discussed: (i) Fisker's 30-50 key employees, (ii) approaching the DOE for access to frozen funds so that it could find stalking horse bidders for a bankruptcy sale or an alternative going concern transaction, (iii) proposals for going concern sales and packaged asset sales in conjunction with the aforementioned, and (iv) the formation of "NewCo" for the stalking horse process. (FPO at ¶¶ 10, 21–23.) It was conceptualized that NewCo would hold the key assets necessary for a relaunch of PHEV manufacturing and would employ Fisker's key employees. (FPO at ¶ 23.)

On March 15, 2013, Fisker representatives met with the DOE to request continuing access to the remaining $10.3 million balance of the debt reserves account. (FPO at ¶ 24.) Representatives from the DOE recommended that Fisker begin planning for a potential bankruptcy if the DOE did not grant access to the funds. (FPO at ¶ 24.) The DOE rejected Fisker's request for access to the funds three days later. (FPO at ¶ 25.)

On March 21 and March 26, 2013, the Board discussed the DOE's request that Fisker terminate the majority of its employees and file for bankruptcy. (FPO at ¶¶ 27, 30, 33.) Also on March 26, 2013, Huron made available its executive, Hugh Sawyer, to serve as Fisker's Chief Restructuring Officer. (P.E. No. 22 at A206.)

In an email dated March 27, 2013, Mr. Sawyer shared with members of Fisker's Board and management a memorandum enumerating fifty-three Fisker employees needed for the stalking horse process and for a smooth bankruptcy administration. (P.E. Nos. 24 at A216–17 and 25 at A218–20); (FPO at ¶ 34.) Nine employees would be retained for their "[c]ritical expertise needed to support the mechanics of an orderly bankruptcy process, support the post-petition asset sale diligence process[, or support] the potential liquidation of assets." (P.E. No. 25 at A218.) Forty-four employees would be retained for their "[c]ritical knowledge needed to maximize the economic

potential of a post-petition asset sale process and to respond to bidder diligence." (P.E. No. 25 at A219.) The forty-four employees also "represente[ed] [] key aspect[s] of the intellectual capital of the Company" and were "required to derive value from the assets to be sold" because of their "intrinsic[] link[s] to the value of the asset[s]." (P.E. No. 25 at A219.) The remainder of Fisker's employees would face termination in a "headcount reduction." (P.E. No. 26 at A222.) On April 4, 2013, the Board met and unanimously voted to approve Mr. Sawyer's proposed headcount reduction. (P.E. No. 29 at A247.)

On April 5, 2013, Fisker informed 156 employees of their terminations. (FPO at ¶ 40.) The terminated employees (the "WARN Class") also received "WARN Notice" letters. (P.E. No. 31 at A265.) The relevant 180-day WARN Act period ran from the April 5, 2013 termination date until October 2, 2013.

During the WARN Act period, Fisker's management, the Board, and its advisors, shared emails, presentations, and business plans. Two such presentation included: "KARMA relaunch," dated May 29, 2013 (Hybrid's Trial Exhibit "H.E." No. 12 at B164–83), and "Karma Program Restart," dated June 12, 2013 (H.E. No. 21 at B315–73.) By the end of September 2013, only twenty individuals remained employed at Fisker. (FPO at ¶ 56.) After April 5, 2013, Fisker no longer had any employees involved in development, human resources, vehicle sales, service parts sales, marketing, procurement, supply chain management, dealer relations, or customer support, all of which, prior to the headcount reduction, had been departments at Fisker. (FPO at ¶ 56.) Also after April 5, 2013, only two employees of approximately sixteen remained employed in the information technology ("IT") department. (Tr. Day 1, 47:17–18, 48:6–10.) One of the two remaining IT employees testified at trial that, after April 5, 2013, that his day-to-day work transitioned from developing and expanding Fisker's IT systems to mostly keeping the system

from crashing. (Tr. Day 1, 63:2–6.) He also testified that, after April 5, 2013, many IT systems were not being used (Tr. Day 1, 64:14) and other departments stopped making "normal business requests" of IT to modify applications or parts of the system. (Tr. Day 1, 71:25, 72:1–7.)

On October 11, 2013, the DOE held a live auction to sell its interest in the DOE Loan. (FPO at ¶ 57.) On November 22, 2013, the loan sale closed with Hybrid Tech Holdings ("Hybrid"), the winning bidder. (FPO at ¶ 58.) Fisker filed for bankruptcy on November 22, 2013. (FPO at ¶ 58.) Four days later, Plaintiff filed this adversary proceeding.

Although Hybrid is not Fisker's successor in interest,[4] Hybrid retains the right to serve as the defendant in this adversary proceeding. *Order Confirming Debtors' Second Amended Joint Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code (with Technical Modifications)* (D.I. 1137 at 25); *Debtors' Second Amended Joint Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code (With Technical Modifications)* (D.I. 1059 at 28) ("Hybrid . . . shall have the right to defend the WARN Adversary Proceeding and the WARN Adversary Claims on behalf of the Estates.")

## DISCUSSION

The question before the Court is whether Fisker experienced a "cessation of business" within the meaning of §§ 507(a)(4) and (a)(5) of the Code prior to October 2, 2013. Plaintiff argues that Fisker ceased business sometime after the April 5, 2013 headcount reduction but before October 2, 2013 when the WARN Act period ran. Hybrid contends that Fisker either never ceased business or, if it did, that the cessation occurred no sooner than October 2012 when Fisker ceased Karma production but no later than February 2013 when it entered "hibernation mode." Based on

---

[4] Wanxiang America Corporation ("Wanxiang") purchased Fisker in 2014. (Tr. Day 1, 109:14–17.) After purchasing Fisker, Wanxiang (i) hired certain former Fisker employees who had been terminated in 2013 (Tr. Day 1, 112:23–25, 113:18), and (ii) has built and sold a car called the Karma Revero. (Tr. Day 1, 112:14–22.)

the evidence presented, the Court finds that Fisker's business ceased on April 5, 2013 when it terminated the very employees who now bring this claim.

### A. Legal Standard

Section 507(a) affords certain parties an allowed unsecured priority claim. Section 507(a)(4) states in relevant part:

> (a) The following expenses and claims have priority in the following order:
> (4) Fourth, allowed unsecured claims, but to the extent of $12,475 for each individual . . . earned **within 180 days before** the date of the filing of the petition or **the date of the cessation of the debtor's business**, whichever occurs first, for —
> (A) wages, salaries, or commissions, including vacation, severance, and sick leave pay earned by an individual[.]

11 U.S.C. § 507(a)(4). (Emphasis added.) Section 507(a)(5) echoes the same for an employee benefit plan subject to certain unrelated exceptions. 11 U.S.C. § 507(a)(5).

Congress added the "cessation of business" language to "protect employees whose employers stopped paying them, or pays them at a reduced rate, and goes out of business, but then waits longer than [180] days to file a bankruptcy petition." *In re Bodin Apparel, Inc.*, 46 B.R. 555, 559 (Bankr. S.D.N.Y. 1985) ("*Bodin I*"), *aff'd*, 56 B.R. 728 (S.D.N.Y. 1985) ("*Bodin II*") (citation omitted). For this reason, the term "cessation of business" must be "construed broadly" rather than with "exacting literalness." *Bodin II*, 56 B.R. at 731. Moreover, courts are "not bound by legal formalism" and "may always pierce a paper existence." *Davidson Transfer v. Teamsters Pension Trust Fund*, 817 F.2d 1121, 1123–24 (4th Cir. 1987).

Although there is surprisingly little case law available on this issue, the Court finds helpful the balancing test set forth in *In re Adcock Excavating, Inc.*, 42 B.R. 84 (Bankr. N.D. Ill. 1984). Pursuant to that test, the Court looks first to "whether at some point prior to filing for bankruptcy

8

the debtor had discharged substantially all its employees," and second to "whether the debtor had ceased performing its usual work and whether the debtor had liquidated or continued in business." *Bodin II*, 56 B.R. at 732 (citing *In re Adcock Excavating, Inc.*, 42 B.R. at 85–86).

*B. Analysis*

### 1. Fisker Discharged Substantially All Its Employees

The first issue is whether Fisker, at some point prior to filing for bankruptcy, discharged "substantially all" its employees. *Id.* (citing *In re Adcock Excavating, Inc.*, 42 B.R. at 85–86). Although this issue is not in dispute, and Hybrid acknowledges that it weighs in Plaintiff's favor (Tr. Day 1, 15:22–25), the Court reviews the applicable case law.

In *Adcock*, 42 B.R. at 85, the debtors were involved in the businesses of paving and excavating. Within the two months preceding its bankruptcy petitions, the debtors terminated approximately all but one engineer. *Id.* The remaining engineer continued to perform paving and excavating jobs up until the debtors filed their bankruptcy petitions. *Id.* at 85–86. In reviewing the facts, the court in *Adcock* oddly (in the Court's view) found that the debtors did not "discharge substantially all its employees prior to filing so as to conclude that it ceased doing business prior to the filing of the Chapter 11 petition." *Id.* at 87. The apparent reason for the court's finding was that the single remaining employee continued to perform the debtors' paving and excavating work.

The court in *Davidson Transfer*, 817 F.2d at 1122, likewise found that the debtor did not cease doing business despite the termination of a large portion of its employees. There, the debtor consisted of four operating divisions, employed over 800 workers and engaged in the transportation and moving business. *Id.* Due to financial hardships associated with the debtor's general freight division, the debtor decided to eliminate the division and terminate its approximately 600 employees. *Id.* Although the debtor terminated approximately 75% of its

workforce, the court determined that the debtor did not experience a "cessation of business" because the other three operating divisions continued in business as they did prior to the closing of the subdivision. *Id.* at 1123–24.

Conversely, in *In re Stunzi, U.S.A., Inc.*, 7 B.R. 401, 403 (Bankr. W.D. Va. 1980), the court determined that the debtor did in fact cease business prior to filing its petitions. There, a representative for the debtor provided a union representative notice of the debtor's decision to cease and terminate manufacturing operations at the debtor's plant. *Id.* With that notice, all the debtor's employees were terminated "except a special few who performed temporary duties for the closing of the plant and protection of assets." *Id.*

Here, Fisker terminated 156 employees on April 5, 2013, leaving only fifty-three individuals employed. (FPO at ¶ 40.) By the end of September 2013, Fisker had only twenty employees. (FPO at ¶ 56.) When Fisker filed its petitions for bankruptcy on November 22, 2013, approximately 90% of its employees had been terminated. At first glance, layoffs in this quantity appear to be a company's termination of substantially all its employees. But implicit in the *Adcock* test is the requirement that something more than a decrease in headcount is needed to establish the discharge of "substantially all" of the debtor's employees within the context of the term "cessation of business." In other words, "substantially all" is not merely a mathematical exercise. Rather, the Court looks to the qualitative aspects of the work the remaining employees performed. The court in *Stunzi* lends the Court guidance as to what the something more may be: it is the retention of a "special few" employees to perform duties germane to the preparation of a bankruptcy filing, when the company contemplates filing for bankruptcy over the horizon, instead of conducting its usual and principal business. *See In re Stunzi, U.S.A., Inc.*, 7 B.R. at 403.

In this instance, Mr. Sawyer, then the CRO, expressed that the fifty-three employees retained by Fisker after the April 5, 2013 headcount reduction included specifically the few key employees necessary to the stalking horse process and for a smooth bankruptcy administration. (P.E. No. 25 at A218) ("Each retained employee was carefully selected in a review conducted by management and advisors and the employees were linked to specific assets that are currently being marketed through the sale process or the employees are necessary to support the orderly administration of a bankruptcy process."); *see also* FPO at ¶ 39. Fisker's termination of the other approximately 75% of its workforce on April 5, 2013—and its additional pre-petition terminations—together with its deliberate retention of only a "special few" employees it deemed necessary to navigate the bankruptcy it contemplated filing over the horizon, satisfies the first inquiry under *Adcock*.

## 2. Debtor Ceased Performing Its Usual Work and Did Not Continue in Business

The second issue is whether Fisker ceased performing its usual work and whether it had liquidated or continued in business. *Bodin II*, 56 B.R. at 732 (citing *In re Adcock Excavating, Inc.*, 42 B.R. at 85–86.) The Court reviews the two inquiries together because in order to determine whether the debtor ceased its usual work or continued in business, the Court must first answer the question present in the subtext of both inquiries: *what* was the debtor's business?

Plaintiff argues that Fisker was in the car manufacturing business. Hybrid argues, however, that Fisker's business included anything done in pursuit of its *goal* of designing, assembling, and manufacturing cars, including (i) searching for sources of badly needed funding and (ii) planning for a restart of production if and when such funding could be secured. In support of its argument, Hybrid relies on emails, presentations, and business plans shared between Fisker's management, the Board, and its advisors, created during the WARN Act period. Hybrid highlights certain

11

exhibits, which were admitted into evidence, including the following presentations: "KARMA relaunch," dated May 29, 2013 (H.E. No. 12 at B164–83), and "Karma Program Restart," dated June 12, 2013 (H.E. No. 21 at B315–73.)

The "KARMA relaunch" and "Karma Program Restart" programs certainly expressed Fisker's *goal*. But the goal alone, without the *capacity* to "relaunch" or "restart" Karma production, fails to negate the fact that Fisker's business, the "designing, assembling, and manufacturing" of PHEVs (P.E. No. 48 at A409), had ceased when Fisker no longer maintained the necessary employees to achieve the goal.

The Court considers how other courts determined the nature of a debtor's business. In *Bodin I*, 46 B.R. at 557, the court determined that the debtor was a clothing manufacturer because its "principal business activity was the design, manufacture and sale of sportswear." In *Boatwright v. Rau (In re Rau)*, 113 B.R. 619, 621 (B.A.P. 9th Cir. 1990), the court determined that the debtor was both a mining business and a restaurant business because "the debtors' mining operation was entirely separate from their restaurant, except for the fact of their common ownership." Finally, in *In re Elsinore Corp.*, 228 B.R. 731, 733–34 (B.A.P. 9th Cir. 1999), the court held that a holding company with control over multiple subsidiaries that were in the business of operating hotels and casinos was not itself in the business of operating any one specific hotel or casino.

The facts before the Court differ from those in *Elsinore*. There, the holding company in issue "had many subsidiaries and affiliates." *Id.* at 732. Here, however, Fisker's corporate structure provides that Fisker Automotive Holdings, Inc.'s only subsidiary is Fisker Automotive, Inc. *Disclosure Statement for the Debtors' Second Amended Joint Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code* (D.I. 984-2 at 2.) The facts before the Court are also dissimilar to those in *Rau*. Unlike the debtors in *Rau*, Fisker engaged in only one line of business, that being

the manufacturing of PHEVs. Instead, the facts here are most similar to those in *Bodin I* and *Bodin II*. There, as here, the debtor engaged in the designing, manufacturing, and selling of its products. Applying those findings, the court in *Bodin I* found the debtor to be a clothing manufacturer. *See Bodin I*, 46 B.R. at 557 ("Although Bodin's principal business activity was the design, manufacture and sale of sportswear, it asserts that the activities it was engaged in . . . constituted doing business.") In this instance, the Court finds that Fisker was a car manufacturer.

Having established what Fisker's business was, the Court turns to (i) whether Fisker ceased its usual work and (ii) whether it had liquidated or continued in business. *Bodin II*, 56 B.R. at 732 (citing *In re Adcock Excavating, Inc.*, 42 B.R. at 85–86).

   i. Fisker Ceased its Usual Work

A debtor's usual work is necessarily defined by its business. When the debtor has more than one business, "all of the debtor's various business operations" are considered "in aggregate." *In re Rau*, 113 B.R. at 622. But when the debtor does not operate more than one business operation, the Court looks to the debtor's principal business. *See Bodin I*, 46 B.R. at 560 (citing *In re Stunzi, U.S.A., Inc.*, 7 B.R. at 403) ("The *Stunzi* court found the date of cessation to be the date when cessation logically occurred, i.e. the date when all employees necessary to the debtor's *principal business* activity were terminated.") (Emphasis added.) The Court has found that Fisker was a car manufacturer. Therefore, Fisker's "usual work" consisted of the design, manufacturing, and sale of cars, and not the "planning" for a restart of Karma or Atlantic, or morphing into a powertrain company, as Hybrid argues. (Tr. Day 1, 24:17–18.) The Court therefore must determine whether Fisker ceased its usual (design, manufacturing, and sale) work.

In *Bodin I*, 46 B.R. at 561, the court held that the debtor ceased its usual work as a clothing manufacturer when it last maintained its manufacturing facility. The court reasoned that shipping

the debtor's remaining goods and engaging in the sort of work that accompanies the winding-down of a business is not "doing business" within the context of the debtor's business. *Id.* However, in *Davidson Transfer*, 817 F.2d at 1123, the court found that the debtor did not cease its usual transportation and moving work despite having eliminated one of its four subdivisions because the remaining three operating divisions continued in business. And in *Adcock*, 42 B.R. at 87, the court determined that the debtors did not cease business because they continued to perform their usual paving and excavating work until the debtors filed for bankruptcy.

The difference as it readily appears to the Court is that the debtor in *Bodin I* and *Bodin II*, when it no longer maintained its manufacturing facility, did not have the capacity to reengage in and facilitate its usual work; whereas, the debtors in *Davidson Transfer* and *Adcock* did not foreclose any such opportunity. Fisker, like the debtor in *Bodin I* and *Bodin II*, ceased its usual work when it could no longer seamlessly reengage in manufacturing the PHEVs it designed. Fisker did not cease its usual work in October 2012 when it officially discontinued Karma production. This only resulted in Fisker entering what it called "hibernation mode." (FPO at ¶ 18.) Even in hibernation mode, however, Fisker continued the employment of a critical portion of its workforce. Fisker maintained the capacity to awaken from hibernation through a restart of Karma production or a meaningful initiation of the Atlantic program. But Fisker shifted from hibernation to near death when, on April 5, 2013, it executed the headcount reduction to terminate all its employees except for the "special few" retained to navigate the stalking horse process and bankruptcy administration. After April 5, 2013, Fisker no longer had any employees involved in development, human resources, vehicle sales, service parts sales, marketing, procurement, supply chain management, dealer relations, or customer support. (FPO at ¶ 56.) And it is not disputed that after April 5, 2013, Fisker lacked the sufficient workforce to actually roll cars off the assembly line.

(Tr. Day 1, 24:20–22.) As such, Fisker ceased its usual work on April 5, 2013 when it changed gears from manufacturing cars to navigating bankruptcy.

ii. Fisker Neither Liquidated nor Continued in Business

All that remains for the Court to decide is whether Fisker liquidated or continued in business. *Bodin II*, 56 B.R. at 732 (citing *In re Adcock Excavating, Inc.*, 42 B.R. at 85–86). Although Fisker was not liquidated as of October 2, 2013 when the WARN Act period ran, the Court must still determine whether Fisker continued in business. The continuation of debtor's business is the "antithesis of cessation of the debtor's business." *Bodin I*, 46 B.R. at 560. When considering whether a debtor continued in business under *Adcock*, the reviewing court must look to whether the debtor continued in business *a la* its usual work, not merely to whether the debtor's business continued in perpetual corporate existence. *See In re Adcock Excavating, Inc.*, 42 B.R. at 87 ("[I]t appears that the debtor performed its usual work until the time of filing the petitions. Finally, the debtor continues to perform *that work* to the present time. Therefore, the claims . . . should not be granted priority status.") (Emphasis added.) In *Adcock*, the court held that the debtor continued in business specifically because it continued to perform its usual paving and excavating work. *Id.* Because Fisker ceased performing its usual work after April 5, 2013, it also did not continue in business within the meaning of §§ 507(a)(4) and (a)(5) after April 5, 2013. Simply put, when Fisker ceased its usual work, it no longer continued in its normal business. As such, the second inquiry under *Adcock* is satisfied.

## **CONCLUSION**

The Court holds that Fisker experienced a "cessation of business" within the meaning of §§ 507(a)(4) and (a)(5) of the Code before October 2, 2013 when, on April 5, 2013, it terminated Plaintiff and the WARN Class. For the foregoing reasons, Plaintiff and the WARN Class are entitled to priority treatment on their federal WARN Act claims.

Dated: December 27, 2019
Wilmington, Delaware

KEVIN GROSS
UNITED STATES BANKRUPTCY JUDGE